THE STATE BANK OF PIKE, Appellant, *v.* JOHN NAPIER and Others, Respondents.

*Money paid under a mistake of fact, but pursuant to the literal terms of a contract, not recoverable.*

Where a banking corporation upon taking over the business of a banking firm enters into an agreement to pay all the debts and obligations of the firm, "as shown by the books of the said firm at the close of business on the 11th day of April, 1892," and to pay the accrued interest "upon the interest-bearing certificates of deposit issued by the parties of the first part *and now outstanding at this date,* or as shown by their books at the close of business on April 11, 1892," the fact that the agreement was made upon the mutual understanding that the outstanding certificates of deposit amounted to the sum shown upon one of the books of the firm, which had been falsified by its cashier, and that the actual amount of such certificates was in excess of that sum, does not entitle the banking corporation, upon subsequently learning the truth, to recover such excess from the members of the firm, where it appears that there was no fraud in the execution of the contract and that the true amount of the outstanding certificates appeared upon the other books of the firm delivered to the corporation.
SMITH, J., dissented.

APPEAL by the plaintiff, The State Bank of Pike, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Wyoming on the 31st day of January, 1899, upon the dismissal of the complaint as to all the defendants, except the defendant Adams, by direction of the court after a trial before the court without a jury at the Erie Trial Term.

*Greenleaf S. Van Gorder* and *Elijah W. Holt,* for the appellant.

*George E. Spring,* for the respondents.

HARDIN, P. J.:

On the 12th day of April, 1892, the parties entered into a written agreement which is set out in the pleadings. In that agreement the defendants agreed to transfer to the plaintiff all their business, with substantially all the assets belonging thereto. In consideration of such transfer the plaintiff agreed to assume, become responsible for and pay upon demand all the debts and obligations then owing by the defendants' said firm, as shown upon its books at the close of business on the 11th day of April, 1892.

It is found by the trial judge in the 4th finding, viz.: "That all the certificates of deposit mentioned in Schedule 'B' of the complaint were duly issued by the defendants' firm before the execution of said contract; that the same were all shown by the books of said firm at the close of business on the 11th day of April, 1892; that said certificates then aggregated the sum of $39,369.51, and they were all paid by the plaintiff at the times stated respectively in said Schedule 'B.'"

It is found expressly as a fact, and the evidence warrants the finding, "that the defendants did not make any fraudulent statements or representations to the plaintiff as to said certificates of deposit or their aggregate amount, and there was no mistake on the part of either party as to the terms of said written agreement."

The language found in the agreement executed by the parties is broad and comprehensive. It is, viz.: "That the party of the second part agrees to assume, become responsible for and pay upon demand all the debts and obligations now owing by the banking firm of Adams, Weed & Co., as shown by the books of the said firm at the close of business on the 11th day of April, 1892."

The words are very comprehensive. They contain no exception or limitation. They are not restricted to any particular book or particular statement or "daily brief."

If the plaintiff had desired to limit or restrict its obligation in the assumption of the debts of the debtors, it might have specified that the obligations were restricted to those that were mentioned in the daily brief. They omitted to have any such words inserted in the agreement.

The subsequent language of the contract favors the construction which we have intimated. Near the close of the contract we find

the following language: " It is further agreed that the parties of the first part agree to pay to the party of the second part all the interest which shall have accrued to this date upon the interest bearing certificates of deposit issued by the parties of the first part *and now outstanding at this date,* or as shown by their books at the close of business on April 11th, 1892."

The trial court seems to have followed the literal language of the agreement, and has, therefore, found that the payments made by the plaintiff are the payments which it stipulated to make.

Plaintiff is not entitled at this stage of the action to insist upon a reformation of the contract. (*Greene* v. *Smith,* 160 N. Y. 541.)

It seems that the books which had theretofore been kept by the defendants' firm, on which all of the certificates of deposit were correctly shown, were passed into the hands of the plaintiff at or about the time of the consummation of the contract, and have been in the exclusive possession of the plaintiff ever since the making of the agreement. As those books showed the certificates which the plaintiff has paid, we think it has done no more than to carry out literally the agreement which it undertook with the defendants.

If the foregoing views are correct it follows that the decision at the Trial Term was correct, and that the judgment entered thereon should be affirmed.

ADAMS and McLENNAN, JJ., concurred; SMITH, J., dissented, in opinion; SPRING, J., not sitting.

SMITH, J. (dissenting):

The plaintiff is a domestic banking corporation doing business at Pike, Wyoming county. The defendants were copartners engaged in the banking business at Pike from February, 1889, to and including the 11th day of April, 1892, under the firm name of Adams, Weed & Co. On October 12, 1892, the plaintiff succeeded to the business of the defendants, purchased all of the assets of the defendants and assumed all of their liabilities. The contract between them was evidenced by a writing of date, 12th of April, 1892, by which writing this plaintiff agreed " to assume, become responsible for and pay upon demand all the debts and obligations now owing by the banking firm of Adams, Weed & Co., as shown by the books of the said firm at the close of business on the 11th day of April,

1892." In making that contract, Mr. Stebbins acted for the plain-- tiff and Mr. Adams acted for the defendants.

In ascertaining the condition of the business and the extent of the assets and liabilities both parties relied upon the showing of one of the defendants' book known as the "Daily Brief" or "Daily Statement Register," which purported to show the trial balance at the close of business on each day. From that book it appeared that there were certificates of deposit outstanding to the amount of $3S,078.02. The fact was that this book had been falsified by one. White, who was the cashier of the defendants, and who became, at. its organization, the cashier of the plaintiff. The actual amount of the outstanding certificates of deposit was in fact $39,369.57, being $1,291.09 in excess of the amount as shown by the said "Daily Brief." These certificates were paid from time to time as they were presented until some four or five years later suspicions were aroused as to the accounts of this cashier. An expert was put upon the books, and this discrepancy was then discovered and the further fact that the plaintiff had paid the full amount of the certificates. Demand was thereupon made by the plaintiff of the defendants for the repayment of the sum of $1,291.09, which was refused, and this action was. brought to recover those moneys.

Courts are no longer embarrassed by forms of actions. By sec- tion 1207 of the Code of Civil Procedure, "Where there is an' answer, the court may permit the plaintiff to take any judgment consistent with the issue made by the complaint and embraced within the issue." Whatever the plaintiff, therefore, may have named his. action, whether at law or in equity, whether for moneys had and received or for moneys paid to the use of the defendants, it may have any relief to which the facts as pleaded and proven may entitle it.. The court at Special Term has found that all of these certificates. of deposit appeared somewhere upon the books of Adams, Weed &. Co. Under the terms of the contract then the plaintiff was required. to pay them. By the testimony, however, of both of the parties; signing the contract, that contract was made without fraud and with, the mutual understanding that the certificates of deposit amounted only to $38,078.42, whereas in fact they amounted to $1,291.09 in. excess of that sum. The defendants were liable for the full amount of the outstanding certificates. Supposing that amount to be

$38,078.42, they have presumptively put into the hands of the plaintiff assets of that amount with which to pay them. By reason of this mutual mistake, this plaintiff has in fact paid on these certificates upwards of $1,200 in excess of the assets placed in its hands with which to pay. These defendants have been relieved from liability upon over $1,200 of indebtedness for which they have paid no consideration.

In *Wheadon* v. *Olds* (20 Wend. 174) the head note reads: " Where a contract is made upon an assumed state of facts in reference to which there is a *mutual mistake*, money paid under such contract may be recovered back, *pro tanto*, in an action of assumpsit; and *it was accordingly held* in this case, where a contract was made for the sale and delivery of oats, and the parties under a mistaken state of facts, estimated the quantity at a certain number of bushels, for which the stipulated price was paid, that the purchaser was entitled to recover back money paid for the *difference* between the estimated and real quantity; and that, notwithstanding he had agreed to take the oats at the estimated quantity, *hit or miss*."

If this contract had provided, instead of paying these certificates to the holders, that plaintiff should pay to the defendants the money with which these certificates should be paid and these moneys had been paid in pursuance of such agreement, under the authority cited, the law would compel the return of the excess by an action as for moneys had and received. The defendants would then have received $1,200 more than they had paid for, and by the law of natural justice an agreement is implied to return those moneys. By parity of reasoning, the law will imply a promise to repay moneys paid to holders of certificates under such a mistake. That the defendants have not actually received the moneys cannot lessen the moral or legal obligation to repay the same. A debt which they were owing has been canceled by the plaintiff without consideration through a mistake caused by their misrepresentation. It can work no injustice to the defendants to imply a promise to pay to the plaintiff the debt which the plaintiff has paid for them.

Again, if need be, the plaintiff may call to its relief the equitable doctrine of subrogation. In 24 American and English Encyclopædia of Law, at page 284, the text reads: " A party who pays a debt for which he supposes himself to be liable as surety, when in fact he is

STATE BANK *v.* NAPIER.

under no legal obligation to pay, occupies no better attitude than a mere stranger or volunteer, and is not entitled to subrogation to the creditors' rights against the principal or the latter's vendee. But if the mistake be one of fact and not of law, the rule is otherwise — unless it should appear that the party had the means of correct information within his power, but negligently omitted to avail himself of them. Accordingly, where one, in the belief that he was surety on the bond of an administrator, settled with the next of kin who were under the same impression, the administrator being insolvent, he was adjudged entitled to be subrogated to the rights of the next of kin against the real sureties on the bond."

In *Hullett* v. *Hood* (19 So. Rep. 419) the head note reads: "An administrator who, at his own risk, pays debts not of the preferred class before he has had time to ascertain the insolvency of the estate may be subrogated to the rights of the creditors whose claims he has paid." This rule of subrogation seems to rest upon the mere payment under a mistake of fact. Where, however, that mistake of fact has arisen through the defendants' misrepresentation by their own books, the right to equitable relief would seem stronger. This plaintiff might recover here as an equitable assignee of these certificates the amount in excess of $38,078.02.

The defendants contend that the plaintiff only performed its agreement made to pay the outstanding liabilities. In the case of *Wheadon* v. *Olds* (*supra*) the plaintiff only performed his contract, and yet he was allowed to recover back the moneys paid because his contract was induced by mutual mistake of a material fact. In the case at bar, confessedly, the contract was induced by a mutual mistake of a material fact. In the case cited, the money was paid to the defendant and the court directed its return. In the case at bar, the money was not paid to the defendants but to the defendants' creditors and extinguished the creditors' debt against the defendants. In either case the conscience of the court is invoked to compel the return to the plaintiff of moneys paid to the defendants or to their use without consideration and in performance of a contract which was induced by a mutual mistake of a material fact.

It is further contended on the part of the defendants that the plaintiff is without right to relief because of its neglect. Under the authorities in this State, however, even negligence does not bar

them from this relief. In *Mayer* v. *Mayor* (63 N. Y. 455) the head note reads : " Money paid under a mistake of a material fact may be recovered back, although there was negligence on the part of the person making the payment, unless the position of the party receiving it has been changed in consequence thereof, and it would be inequitable to allow a recovery." But a finding of negligence, either in making the contract or in paying these moneys, would have no support in the evidence. This cashier had falsified the books for fraudulent purposes. He was the defendants' cashier, and was to act as cashier of the plaintiff. He was trusted by both parties. Not a fact is shown to give to either party any ground of suspicion or to lead any party to do otherwise than to proceed upon the assumption that the defendants' books were honestly and accurately written.

Again, the defendants contend that these moneys cannot be recovered because they were paid voluntarily. To this contention I cannot accede. Payment made under a mistake of fact is never a voluntary payment. Nor is the knowledge of White, as their cashier, chargeable to the plaintiff so as to make the payment voluntary. In 1 American and English Encyclopædia of Law (p. 423) the text reads : " While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating." The authorities cited sustain the doctrine of the text. The information which this cashier had which the defendants would impute to the plaintiff was information which this cashier obtained in a fraudulent scheme while he was the agent of the defendants. There is no presumption that he would disclose to the plaintiff such information. There is every presumption that he would conceal it. There is no stronger reason for holding the payment voluntary through the knowledge of this cashier than there is for holding the defendants' contract fraudulent through the knowledge of this cashier, as defendants' agent, of the falsity of defendants' books.

Whether, therefore, the plaintiff's right to recover be put upon obligation implied by law to repay what ought to be paid, or whether it be put upon the doctrine of equitable subrogation, the action is one of those actions which must be governed by equitable principles.

In *Roberts* v. *Ellwood* (116 N. Y. 652) Judge FOLLETT, in writing for the Court of Appeals, says: "The second cause of action for money had and received is a kind of an equitable action in which the recovery, if had, must be according to what is just and good *ex æquo et bono.* * * * To have entitled the plaintiff to recover under this count the evidence should have shown that the defendants had received money from the plaintiff, which, in good conscience, the defendants ought not to have retained. To have established this the plaintiff might have shown that the defendants defrauded him, * * * or he might have shown that there was a mistake which resulted injuriously to him." That these defendants should, in good conscience, repay to the plaintiff these moneys, seems to me clear; that plaintiff's right to recover may be found in recognized principles of equity seems equally clear.

The judgment should, therefore, be reversed.

Judgment affirmed, with costs.